## Case No 11,068.

### PHELAN v. HAZARD.

[5 Dill. 45; 6 Cent. Law J. 109; 5 Reporter, 363; 24 Int. Rev. Rec. 70; 25 Pittsb. Leg. J. 143.] [1]

Circuit Court, E. D. Missouri. 1878.

LIABILITY OF SHAREHOLDERS IN CORPORATIONS—PAYMENT IN PROPERTY.

1. Unless prohibited by statute, an agreement between the incorporators of a company and the directors, by which the former convey to the company property needed for the purpose of its operations, and receive payment therefor in full-paid shares of the stock of the company, is, in the absence of fraud, binding upon the parties, and such stock is full-paid stock.

[Cited in Steacy v. Little Rock & Ft. S. R. Co., Case No. 13,329.]

[Cited in Clayton v. Ore Knob Copper Co., 109 N. C. 385, 14 S. E. 39; Coffin v. Ransdell, 110 Ind. 422, 11 N. E. 23; Eylton Land Co. v. Birmingham Warehouse & Elevator Co., 92 Ala. 407, 9 South. 132; Jackson v. Traer, 64 Iowa, 469, 20 N. W. 764; Young v. Erie Iron Co., 65 Mich. 126, 31 N. W. 814.]

2. Whether subsequent creditors of the company can impeach such transaction as respects shares of stock which purport to be full-paid shares, when they are in the hands of a subsequent registered transferee for value, and who purchased the same as full-paid shares, relying upon the certificates and the records of the corporation that full payment therefor had been received by the company, quaere?

[Cited in Steacy v. Little Rock & Ft. S. R. Co., Case No. 13,329.]

[Cited in First Nat. Bank of Deadwood v. Gustin Minerva Con. Min. Co., 42 Minn. 327, 44 N. W. 200.]

3. The petition of a creditor of the company which had become insolvent and dissolved was held not sufficient to open an inquiry into the transaction between the corporators and the company as to the value of the property conveyed to the company in payment of shares, with a view to hold a shareowner for the difference between the agreed value and the actual value of the property conveyed.

The plaintiff is a creditor of the La Motte Lead Company, in which the defendant is a

shareholder. The plaintiff in his petition alleges that the said company was incorporated as a manufacturing and business corporation under the laws of Missouri (1 Wag. St. 332); that said company issued to Rowland G. Hazard, John G. Copelin, William A. Scott, and R. B. Lockwood all of the stock it ever issued, of which said Rowland G. Hazard received and held eleven hundred and twenty-five shares, and on the 25th day of October, 1873, transferred eleven hundred and twenty-four of said shares to the defendant, Rowland Hazard, which he still holds, and that said shares have never been paid for by any person to the said company, in whole or in part, but remain wholly unpaid. The petition then alleges that the Central Savings Bank, of which the plaintiff is the assignee, owns and holds certain unpaid promissory notes of the said La Motte Lead Company, dated in April, June, August, and September, 1873; that suit was brought thereon within one year after the same became due (1 Wag. St. p. 336, § 13), and that there is due thereon to the plaintiff, from the La Motte Lead Company, $110,000; that there has been no meeting of the directors of said company since March 10, 1871, and that said company, before and at the time the said notes fell due, was, and still is, insolvent, and without property, and that it has wholly ceased to do business. The petition also states that, by the laws of Missouri, the defendant is liable for the plaintiff's debts aforesaid to the extent of the par value of said eleven hundred and twenty-four shares; wherefore the plaintiff demands judgment against the defendant, Rowland Hazard, for the amount of his said debt against the La Motte Lead Company. The answer admits the incorporation and organization of the La Motte Lead Company, as alleged; that Rowland G. Hazard was an original subscriber for stock, and received eleven hundred and twenty-five shares; that he transferred eleven hundred and twenty-four shares thereof to the defendant, Rowland Hazard. The answer denies that the said shares were not paid for, and avers that said company was paid for the same in full at the time the certificates of stock were issued; that they were issued as full-paid stock, and that the records and books of the corporation so showed, on the faith of which the defendant bought of the said Rowland G. Hazard the said eleven hundred and twenty-four shares for value as full-paid stock, and the same was transferred to him on the books of the company. Such were the issues joined, so far as it is now material to state them. On the trial the facts stated in the charge of the court to the jury appeared.

The charge of the circuit judge to the jury, as taken down by the stenographer, was as follows:

"Gentlemen of the Jury: Mr. Lockwood, Mr. Scott, and Mr. Rowland G. Hazard in

[1] [Reported by Hon. John F. Dillon, Circuit Judge, and here reprinted by permission. 5 Reporter, 363, and 25 Pittsb. Leg. J. 143, contain only partial reports.]

1869 owned certain real estate, supposed to be mining property, and known as the Mine La Motte property. They owned it subject to certain mortgages—a mortgage to Fleming for $525,000 on five-sixths of the property, which was a first mortgage, and a mortgage to one Valle on the other one-sixth for about $40,000, or for a considerable sum of money; and the said Rowland G. Hazard held a second mortgage on the property for about $50,000. While the property was in this condition, Lockwood, Scott, and Grant, under the statute of Missouri, framed articles of incorporation to incorporate themselves as the Mine La Motte Company, the name being subsequently changed to the La Motte Lead Company, and in the articles of incorporation the said Rowland G. Hazard, the said Lockwood, and the said Scott were named as directors. When the corporation had been thus organized, the said Lockwood, Scott, and Rowland G. Hazard made a contract with the directors of this company, they being the directors, and the only directors, whereby they agreed to convey the property, subject to these mortgages, to this newly-formed organization, for the consideration of $300,000. The directors of this corporation agreed to purchase it at that rate, and pay for it by the issue of full-paid stock to the vendors. A deed was made by the vendors and accepted by the company, and full-paid stock issued as follows:

|                                      | Shares. |
|--------------------------------------|---------|
| To the said Rowland G. Hazard        | 2,250   |
| "    "    "  B. B. Lockwood          | 375     |
| "    "    "  W. A. Scott             | 375     |
| Making in all                        | 3,000   |

—And certificates were issued for full-paid stock accordingly. The only payment made for this stock was the execution of a deed by Hazard, Scott, and Lockwood to the corporation for an express consideration of $300,000, and reciting therein the incumbrances above referred to. One of the certificates of stock held by the defendant is as follows: 'Organized under the Laws of the State of Missouri. Full-Paid. Non-Assessable. La Motte Lead Company. 50 Shares—Shares $100 each. Capital, $1,000,000. This is to certify that Rowland Hazard is the owner of fifty (50) shares of the capital stock of the La Motte Lead Company, transferable only on the books of the company in person or by attorney on surrender of this certificate. (Signed.) ——, Secretary. ——, President. Mine La Motte, Mo., October 25th, 1873.' The company adopted a by-law as follows: 'The stock of the company shall be assignable or transferable at its office by any holder thereof, either in person or by regularly appointed attorney, in the presence of the treasurer or secretary, or one of the directors.' The books of the lead company, under date of December 3d, 1869, show that, on motion, it was 'Resolved, that the company proceed to the purchase of a tract of land called Mine La Motte, and the pine

lands, agreeably to the proposal for the sale thereof submitted by the owners, and now standing in the names of Bradley B. Lockwood and William A. Scott, and that the secretary be directed to receive a conveyance therefor.' The deed was received and recorded, and subsequently reported to the corporation. Of this $1,000,000 of capital stock, only $300,000 were ever subscribed or issued. The defendant purchased from said Rowland G. Hazard, in good faith, for value, eleven hundred and twenty-four shares of this stock, which he now holds, and which were transferred to him on the books of the company. On these facts, gentlemen of the jury, the plaintiff, in this form of action, and under the averments made in the petition, is not entitled to recover, and it is not competent for the plaintiff in this case to establish a liability on the part of the defendant by showing, in point of fact, that the property originally conveyed by Lockwood, Scott, and Rowland G. Hazard to the company was not worth $300,000, or that it was not worth anything over and above the mortgages upon it at the time of the transfer to the company in payment of the stock subscribed, even although the said corporation is insolvent and dissolved, as alleged in the petition."

The jury thereupon found a verdict for the defendant. The plaintiff moved for a new trial, on the ground that the foregoing charge was erroneous in point of law. The motion was overruled, for the reasons stated in the opinion of the court.

Broadhead & Conroy, for plaintiff.
Noble & Orrick, for defendant.

Before DILLON, Circuit Judge, and TREAT, District Judge.

DILLON, Circuit Judge. The gravamen of the plaintiff's case is that the defendant is the holder, by transfer, of certain unpaid shares of stock in the La Motte Lead Company, and that, under the statutes of Missouri (1 Wag. St. p. 293, § 22), the plaintiff, as a creditor of that company (which is insolvent and dissolved), may compel the defendant to pay for the said shares held by him, or pay the balance due thereon. As between the transferrer of said shares and the corporation which issued them, it was agreed that the shares had been fully paid for by the transferrer to the company.

The charge to the jury was given without any opportunity to examine the law, and in accordance with what seemed, at the moment, to be the principle applicable to the case as made at the trial. Mr. Broadhead's argument at the bar for the plaintiff, in support of the motion for a new trial, tended to shake the impressions I had at the trial; and this, in connection with the importance of the case, in the amount as well as the principles involved, has induced me to look into the matter with some care and deliberation.

It will be observed that the petition charges no fraud in the agreement by which the corporation purchased the mining property and received a conveyance thereof, in payment for which, and as part of the same transaction, it issued its paid-up shares of stock. The records of the corporation showed the whole transaction—that it had received and recorded a deed for the property, and paid the consideration agreed upon by the issue of full-paid certificates of stock to the vendors. This was long anterior to the creation of the indebtedness to the plaintiff's assignor.

The plaintiff—a single creditor—does not for himself, or for himself and other creditors, file a bill to impeach as fraudulent this transaction between the corporation and the original shareholders; but he simply states that the shares of stock issued to Rowland G. Hazard have not been paid for, either by him or by the defendant, the transferee and present holder of the shares. Issue was taken on this averment, and the proof showed that the shares in question had been paid for precisely as they were originally agreed to be paid for, viz.: by a conveyance of the mining property to the corporation. This conveyance has been received and recorded by the corporation. Unless this agreement is rescinded or set aside for fraud, how can it be said that the stock has not been paid for? The parties have agreed that it has been paid for, and that agreement is conclusive, unless it is rescinded or impeached for fraud, and this cannot be done unless the attack is directly made. Undoubtedly such an attack could be made while the stock was in the hands of the original takers of it; but it is not so clear that it could be made by a subsequent creditor of the corporation against a transferee of the stock for value, who purchased the same in good faith as full-paid stock, relying upon the records of the corporation, which showed the shares to have been fully paid for, and the manner in which the payment had been made.

Lord Justice Mellish, in one case, seemed to be of opinion that a bona fide transferee of shares of stock which purported to be full paid, held the same exempt from a liability to be called upon to make payment therefor on the ground that the original subscriber had not fully paid for them. But it is not necessary, under the pleadings in this case, for us to consider or determine that question.

The cases are numerous in which such transactions as that which was entered into in this instance between the owners of the mining property and the corporation which they formed have come before the courts, and, in absence of fraud, have been sustained: Pell's Case, L. R. 5 Ch. 11; In re Baglan Hall Colliery Co., Id. 346; Maynard's Case, L. R. 9 Ch. 60; Schroder's Case, L. R. 11 Eq. 131; Cleland's Case. L. R. 14 Eq. 387; Sichell's Case, L. R. 3 Ch. 119; Jones' Case, L. R. 6 Ch. 48; Forbes' Case, L. R. 5 Ch. 270; Pritchard's Case, L. R. 8 Ch. 956; Ferrao's Case, L. R. 9 Ch. 355; Bush's Case, Id. 554; Dent's Case, L. R. 8 Ch. 768; Carling's Case, 1 Ch. Div. 115; Savage v. Ball, 17 N. J. Eq. 142; Smith v. North American Min. Co., 1 Nev. 423; Goodrich v. Reynolds, 31 Ill. 490; Spense v. Iowa Valley Construction Co., 36 Iowa, 407, 411.

The exigencies of the case now before the court do not require us to examine into the soundness or consistency of all these decisions. We shall refer to a few of them by way of illustration, and because, whatever else they hold, they clearly establish these propositions: (1) That such a transaction as that here in question is not ultra vires, and absolutely void. (2) That the contract is valid and binding upon the corporation and the original share-takers, unless it is rescinded or set aside for fraud, and that, while the contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat that as a payment which the parties have agreed should be payment.

These propositions are decisive of the present case.

For the purpose above indicated, a brief statement of some of the English cases upon this subject will now be given. In the origin, purposes, situation of the property, and fate of the company, the Case of Baglan Hall Colliery Co., L. R. 5 Ch. 346, is strikingly analogous to the Case of the La Motte Lead Company. In the case just cited, nine persons bought a moiety of a colliery from Parker for £10,000, and the ten, after working it for some time, agreed to form a company for carrying it on, and a company was accordingly registered, the memorandum of association of which was subscribed by the owners of the colliery for numbers of shares proportioned to their respective interests; the nominal amount of shares subscribed for being £20,000. The memorandum of association stated nothing as to the shares being treated as paid-up shares, but the articles of association provided that all the shares subscribed for in the memorandum should be treated as fully paid up. The colliery was made over to the company, but no other payment was made by any of the subscribers of the memorandum. No other shares than those subscribed for by the memorandum were ever allotted; and it was held (reversing the decision of Malins, vice-chancellor) that the subscribers of the memorandum of the association were not liable as contributories, for that the shares must be taken as having been fully paid up by the handing over the colliery. In pronouncing his judgment on appeal, Lord Justice Giffard said: "Here was a colliery in which at first Parker was alone interested. He sold a moiety to certain gentlemen for £10,000, which was paid. The colliery was then subject to two mortgages, for £3,000 and £1,000.

The owners went on working the colliery, not very successfully, and then determined to form a limited company, in order to avoid incurring further personal liability. It was the policy of the companies act to enable this to be done, and with the soundness of that policy we have nothing to do."

After stating that the colliery had been handed over to the company in consideration for the shares of the subscribers, the lord justice adds: "According to the decided cases, this, in the absence of fraud, was an effectual paying up of the shares in full. The test to be applied is this: Could the company, by any proceeding, have set aside the transaction by which it was arranged that the owners of the colliery were to have paid-up shares as the price of their interests in the colliery? And I say, on the evidence, that the company clearly could not. It was urged that the parties only agreed with themselves, and that therefore there was no contract. But every company is started by parties agreeing among themselves, and it is idle to say that they have nobody to agree with. There is nothing in the evidence to show that any person has been deceived. It appears probable that if the additional £3,000 which was raised by the last mortgage had been applied in working the colliery, the concern would have prospered." (The colliery had been sold by the mortgagee under his power of sale for £4,500.) "The case is precisely the same as Pell's Case, L. R. 5 Ch. 11, and it must be held that the persons who subscribed the memorandum of association have paid all that they were bound to pay. Creditors have no ground for complaint, for persons who are about to enter into transactions of magnitude with an individual make inquiry into the state of his circumstances; and so, if they enter into them with a limited company, it is their own fault if they do not inquire into the nature of the memorandum and articles, and look to the register of shareholders. In this case there was no concealment, and it would, in my judgment, be a total misapplication of the act to say that a transaction like the present is not authorized by it. If strangers (no misrepresentation being made) choose to deal with a company without inquiry, they have no right to complain when it turns out that the shareholders are under no personal liability."

"In Pell's Case (above referred to) the master of the rolls," says Lord Justice Giffard, in the same opinion (L. R. 5 Ch. 355), "allowed the agreement between Pell and the company that he should hand over the property to the company, and that his shares should be taken as fully paid-up shares, to stand, so far as the value of the property went, but directed an inquiry as to its value. This was varied on appeal, and the agreement not being impeached, it was held that the shares must be taken as fully paid up by the handing over of the property."

Commenting on Pell's Case, Lord Chancel-

lor Hatherley said: "The master of the rolls thought that Pell, being bound to pay the full amount of £20 per share, was not to be taken to have paid it in full unless the property he handed over was worth that amount. That result, however, could only be arrived at by rescinding the contract to buy Pell's business, and Lord Justice Giffard thought that the contract, not being impeached, must be treated as a good contract, and one that ought to be acted upon, so that no question could be raised as to the actual value of the business made over." Forbes' Case, L. R. 5 Ch. 270–273; Fothergill's Case, L. R. 8 Ch. 270; Pritchard's Case, Id. 956.

In Schroder's Case, L. R. 11 Eq. 131, shares taken in a company were decided to be lawfully paid for in Confederate bonds, at the market price, and in tea which was required for the company's purposes.

In Spargo's Case, L. R. 8 Ch. 407, decided by the lord justices on appeal, the same doctrine was applied with reference to a company to which the companies act of 1867 (section 25) applied. That section in the act was in these words: "Every share in any company shall be deemed and taken to have been issued, and to be held subject to the payment of the whole amount thereof in cash, unless the same shall have been otherwise determined by a contract duly made in writing and filed with the registrar of joint stock companies at and before the issue of such shares."

Spargo's Case is thus stated by Vice-Chancellor Malins in a subsequent similar case (Coates' Case, L. R. 17 Eq. 169, 177): "Spargo signed the memorandum of association for thirty-one shares, and he was, in consequence, liable to pay £1,550. It does not require the act of 1867 to show that such a person is liable for the amount for which he subscribes, and the vice-warden of the stannaries court put him on the list of contributories, considering that he had incurred a liability by signing the memorandum of association, which could only be discharged by payment in cash. But Spargo had also agreed to sell to the company the lease of a mine for £2,776, and in a settled account they gave him credit for the £2,776 as against the price of his shares. That was treated by the court of appeals as a good payment. The lease of the mine was the thing with which the company was trading, and so they gave him credit for that." And it was held that the aforementioned section 25 of the companies act of 1867 had not altered the law as to what would constitute a good payment for shares.

In Coates' Case, supra, the facts were shortly these: The memorandum of association of a company formed for the purpose of purchasing and carrying on the business before that time carried on by Coates was subscribed by Coates for twenty-five hundred shares, which were of £1 each. It was also subscribed by other persons, by which the number of shares taken amounted to sixty-two

hundred and sixty-five, out of a total capital of seventy-five hundred shares; and the company could only issue fresh shares by special resolution. The articles of association stated that an agreement had been prepared between Coates and the company for the sale of the business to the latter for £5,000, of which one-half was to be in fully paid-up shares of the company. This agreement was executed shortly after the registration of the memorandum and articles of association, and was filed with the register of joint stock companies. As between Coates and the company, the shares for which he signed the memorandum were treated as being the fully paid-up shares which he took as part of the purchase-money, and he was debited in the books with £2,500 due on the shares, and credited with £5,000 as the price of the business. Under these facts it was held that Coates was entitled, even as to creditors of the company, to treat the shares for which he subscribed the memorandum as the same shares as those for which he sold his business, and that the shares were paid for in cash, within the meaning of the 25th section of the act of 1867. "In truth, it appears to me," says Lord Justice James (L. R. 8 Ch. 411), "that anything which amounted to what would be in law sufficient evidence to support a plea of payment would be a payment in cash within the meaning of this provision (section 25 of companies act of 1867). The object of the section was, I apprehend, to prevent such contracts as had been before the court in Pellatt's Case, L. R. 2 Ch. 527, and Elkington's Case, Id. 511, in which a man was to take shares and to pay for them by supplying goods when wanted." Applying these principles to Coates' Case, above referred to, Vice-Chancellor Malins (Coates' Case, L. R. 17 Eq. 169. 179) says: "It is perfectly clear that in this case the company had entered into a contract which would have justified their paying Mr. Coates £2,500 in cash. If they had fulfilled that contract they would have handed him bank notes or a check, which he would have handed back again in discharge of the twenty-five hundred shares for which he signed the memorandum of association. * * * I am, therefore, of opinion that the transaction by which credit was given to Mr. Coates for the value of his business is precisely the same as giving Mr. Spargo credit for the value of his lease. It was settled in account, and they would have been justified in handing the money to him, and then he would have handed it back to them in payment of the calls on the shares for which he had subscribed the memorandum of association. I think, therefore, that Mr. Coates is not liable to pay anything on these shares." The case was one in which the official liquidator of the company, which had become insolvent, sought to enforce the alleged liability of Mr. Coates by having him placed on the list of contributories for twenty-

five hundred shares in the company for which he had signed the articles of association.

Without pursuing the subject more at length, we are of opinion that the direction to the jury was right, and that the motion for a new trial must be overruled. Judgment on the verdict.

NOTE. There are later decisions than those cited in the principal case, to the effect that the bona fide purchaser for value of shares issued by a corporation which falsely purport to be full-paid shares cannot be held liable to pay the same where it is not shown that he purchased with notice of the facts. Foreman v. Bigelow, [Case No. 4,934], Dist. of Mass. Oct. 1878, before Clifford and Lowell, JJ., and where the later cases are referred to. including Nicholls' Case, 26 Wkly. Rep. 334; Burkinshaw v. Nicholls, Id. 819; Steacey v. Little Rock & Ft. S. R. Co. [Case No. 13,329].