Coffin v. Ransdell, Receiver.

No. 12,433.

COFFIN v. RANSDELL, RECEIVER.

CORPORATION.—*Stock Subscription.—Payment in Property.*—Subscriptions to corporation stock need not, in the absence of statutory provisions requiring it, be paid in cash, but any property which the corporation is authorized to purchase, or which is necessary for the purposes of its legitimate business, may be received in payment.

SAME.—*Contract.—Ultra Vires.*—Where a corporation is organized to engage in the manufacture of agricultural implements and to acquire and hold letters-patent for such articles as it may desire to manufacture, a contract to receive in payment for stock subscribed, letters-patent, implements, material and other assets of its predecessor in the same business, a partnership, is not *ultra vires,* but valid and binding.

SAME.—*Overvaluation of Property.—Fraud.—Receiver.—Action for Unpaid Subscription.*—The fact that property received by a corporation in full payment for stock subscription is taken at an overvaluation will not enable a receiver of the corporation to maintain an action against a shareholder as for unpaid subscription, until the transaction has been first impeached for fraud.

| 110 | 417 |
| 139 | 603 |

| 110 | 417 |
| 149 | 61 |
| 150 | 192· |

| 110 | 417 |
| 170 | 694 |
| 170 | 695 |

From the Marion Superior Court.

*A. C. Harris* and *W. H. Calkins,* for appellant.

*B. Harrison, W. H. H. Miller* and *J. B. Elam,* for appellee.

MITCHELL, J.—Daniel M. Ransdell, as receiver of the Unthank Plow Company, a corporation organized under the law of the State of Indiana, brought this suit against Francis A. Coffin, a shareholder, to recover an alleged balance due upon his stock subscription. He alleges that he brings the suit by the especial direction of the court, under whose appointment he is acting as receiver.

From the facts put forward in the complaint, and relied on as a ground of recovery, it appears that the Unthank Plow Company was organized on the 13th day of July, 1881, by Daniel Unthank, Francis A. Coffin and William E. Coffin. The capital stock was fixed at $50,000, divided into 1,000 shares of $50 each. Articles of association were filed, as required by law. These are embodied in the complaint.

"The object and business of the corporation," as set forth in its articles of association, "is the manufacture and sale of agricultural implements, and other articles and machinery, and also to acquire, purchase, and hold letters-patent for such patented articles as it may desire to manufacture."

The three corporators were named in the articles as directors. The articles of association concluded as follows: "The undersigned hereby associate themselves together for the purpose of forming this corporation, and severally subscribe the amount of stock set opposite their names.

(Signed) "DANIEL UNTHANK, 499 shares.
"FRANCIS A. COFFIN, 499 shares.
"WILLIAM E. COFFIN, 2 shares."

These articles were signed July 13th, 1881.

The complaint avers that the corporation was organized as the successor of Unthank & Coffin, a partnership, engaged in the same business as that proposed to be conducted by the corporation, and that the members of the late firm were Daniel Unthank and Francis A. Coffin.

It is charged that the only manner in which there was ever any payment, or pretence of payment, of the stock severally subscribed by Daniel Unthank and Francis Coffin, or either of them, was by turning over to the corporation the property and assets of the firm of Unthank & Coffin, which property and assets, the plaintiff avers, the subscribers, Unthank and Coffin, well knew were not more than one-fourth the amount of the stock so subscribed by them.

Unthank and Coffin, it is alleged, each owned one-half of the property so turned over in payment of their respective subscriptions. It is averred that the property so transferred consisted in part of letters-patent, securing the right to manufacture plows of a certain kind, which letters-patent, it is alleged, were turned in at a valuation of $27,000, each of the late partners taking credit on his subscription for one-half that amount. Plows, and material on hand for the manufacture of plows, estimated at $3,000, were in like manner

Coffin *v.* Ransdell, Receiver.

applied, as were also bills receivable, and credit accounts of the late firm, amounting to $9,000. The balance of the subscription was paid, the complaint avers, " by turning in other alleged assets of Unthank & Coffin, which were not assets at all." What these alleged assets were, or their value, is not stated. It is charged in general terms, that the letters-patent, and other articles and assets so turned in and applied, were vastly overestimated in value ; that the bills receivable were worth less than one-half the amount they were credited for on the subscriptions, all of which it is alleged was well known to the defendant.

From the facts as set forth, and which are substantially stated above, the conclusion is drawn, that the defendant is indebted for at least 75 per cent. of his original stock subscription. An accounting and judgment are prayed.

The appellant contends that the facts stated do not constitute a cause of action against him, and hence that the court below erred in overruling his demurrer to the complaint.

It is fairly inferable from the facts disclosed, that at or subsequent to the incorporation of the company, it was agreed between the directors of the corporation and the defendant, that his interest in the property and assets of the firm of Unthank & Coffin should be transferred and accepted in full payment of his subscription to the stock of the Unthank Plow Company, and that it was so transferred and accepted. The *gravamen* of the plaintiff's case is, that because there was an overvaluation of the property, the transfer and acceptance constituted, as against subsequent creditors of the corporation, payment *pro tanto* only.

Assuming as receiver to represent the creditors of the corporation, the plaintiff, in his official or representative character, asserts the right to ascertain the real value of the property and assets transferred, and to recover from the defendant the difference between such value and the amount subscribed by him, as unpaid subscription.

It is to be noted that there is an entire absence of any

charge or suggestion that the corporation was in any way misled or overreached by the defendant, as to the situation or value of the property; nor does it appear that the transaction was merely colorable, or a mere device on the part of the corporators to absorb the capital stock of the corporation without making what was regarded, and agreed upon, as an equivalent in payment.

The inference is, that the board of directors, comprising all the stockholders, with full knowledge of all the facts, accepted the property and assets in question as payment, and without any fraudulent intent consummated the transaction, which stood without question until it was assailed by the receiver in the manner stated.

It is to be observed, further, that this is not a suit to rescind or set aside the transfer and acceptance of the property, or any part of it, as fraudulent, nor is there any pretence that the transaction was *ultra vires* and void. From the frame of the complaint, and in all its distinctive features, the action is purely a suit at law to collect unpaid subscription to stock.

Accepting the situation, and the property as he found it, the receiver simply says, that the only payment, or pretence of payment, which the defendant ever made of his subscription, was in the manner stated, and that because the property taken in payment was knowingly overvalued by the defendant, and the other corporators, the difference between the actual value of the property and assets so taken, and the amount of the defendant's subscription, remains unpaid.

The argument in support of the judgment of the court below, which was for the plaintiff, rests upon the proposition that the capital stock of a corporation, especially the unpaid subscriptions to such stock, constitutes a trust fund for the benefit of the general creditors of the corporation. This being so, it is argued that the representative of the creditors "has the right as against anybody, and as against any settlement or contract to which they were not parties, to inquire

into the state of the fund, and to insist that all who are really indebted be compelled to pay."

That subscriptions to the capital- stock of a corporation are required to be made in good faith, can not be doubted. Simulated subscriptions by persons who have neither the ability nor purpose to pay, and arrangements between the subscribers and the agents or promoters of a corporation, that subscriptions shall be merely colorable, are a fraud upon the law. This much was decided in the recent case of *Holman* v. *State, ex rel.*, 105 Ind. 569.

The legislative purpose in making provision for corporate organizations was, that subscriptions to the capital stock should constitute a fund, or capital, with which to purchase property necessary for the corporate business, and to enable the corporation to engage in and carry out the purpose of its organization. It is upon the faith of its capital stock, either paid in and invested in available property and corporate assets, or to be paid in, that credit may be extended to the corporation. Having paid, or agreed to pay, their subscriptions for stock, is the consideration upon which the several corporators enjoy exemption from personal liability for corporate debts, except as such liability may be imposed by statute.

It follows necessarily that unpaid subscriptions to the capital stock of a corporation constitute a trust fund for the benefit of creditors; and it follows also, that the officers of the corporation, who are trustees in respect to its property and funds, can not purposely or fraudulently waste or dissipate the corporate assets, nor can they defeat or impair the trust, by accepting merely simulated or fictitious payment of stock subscriptions, or by any other device short of an actual payment of that which is in good faith taken as an equivalent for the stock. *Scovill* v. *Thayer*, 105 U. S. 143; *Sawyer* v. *Hoag*, 17 Wall. 610; *Osgood* v. *King*, 42 Iowa, 478; *Wetherbee* v. *Baker*, 35 N. J. Eq. 501; *Boynton* v. *Hatch*, 47 N. Y. 225; *Crawford* v. *Rohrer*, 59 Md. 599; Thompson

Stockholders, section 129; Morawetz Corp., sections 423, 824, 825.

Any arrangement, therefore, between a stockholder and the officers or agents of a corporation, by which paid-up shares of stock are issued upon merely simulated or nominal payment, whether such payment be made in money or property, is regarded, as between the stockholders and the creditors of the corporation, as a sham, and hence no payment at all. Such payments, like simulated subscriptions, are an evasion of the law, and are, therefore, fraudulent and void.

The affirmation of the foregoing propositions does not, however, meet the exigencies of the plaintiff's case. Having averred an actual substantial payment to, and acceptance by, the corporation of valuable property, while that transaction remains unimpeached and unrescinded, the necessities of the plaintiff's case required that he should show a state of facts which rendered the transaction *ultra vires* and void, or that it was so infected with fraud and bad faith, as that the creditors might treat it as void, without setting it aside.

Whatever may have been formerly held, it is now established that subscriptions to corporate stock need not, in the absence of statutory provisions requiring it, be paid for in cash. The principle is now generally accepted, both in England and America, that any property which the corporation is authorized to purchase, or which is necessary for the purposes of its legitimate business, may be received in payment for its stock. Any payment, whether it be in money or money's worth, so that it be made in good faith, will give the shares so paid for the status of paid-up stock. In the language of Lord Justice GIFFARD, in *Drummond's Case*, L. R. 4 Ch. Ap. 772 : " If a man contracts to take shares he must pay for them, to use a homely phrase, ' in meal or in malt;' he must either pay in money or in money's worth. If he pays in one or the other, that will be a satisfaction." *Fletcher* v. *McGill, ante,* p. 395 ; *Cincinnati, etc., R. R. Co.* v. *Clarkson,* 7 Ind. 595 ; *State* v. *Baily,* 16 Ind. 46 ; *Phelan* v. *Hazard,*

Coffin v. Ransdell, Receiver.

5 Dill. 45; *Van Cott* v. *Van Brunt*, 82 N. Y. 535; *Lorillard* v. *Clyde*, 86 N. Y. 384; *Carr* v. *Le Fevre*, 27 Pa. St. 413; *Philadelphia, etc., R. R. Co.* v. *Hickman*, 28 Pa. St. 318; *Pittsburgh, etc., R. R. Co.* v. *Stewart*, 41 Pa. St. 54; *Foreman* v. *Bigelow*, 4 Cliff. 508; *Liebke* v. *Knapp*, 79 Mo. 22; *Foster* v. *Seymour*, 6 Am. & Eng. Corp. Cases, 533; *Crawford* v. *Rohrer, supra; In re Baglan Hall Colliery Co.*, L. R. 5 Ch. Ap. 346; *Pell's Case*, L. R. 5 Ch. Ap. 11; *Spargo's Case*, L. R. 8 Ch. Ap. 407; *In re Cape Breton Co. Limited*, 50 Law Times, N. S. 390; 18 Am. Law Rev. 256; Thompson Stockholders, sections 127–130; Morawetz Corp., sections 425, 428, 825, 826.

The foregoing, and many other cases which might be cited, afford examples of transactions, such as that here involved, between the owners of property and corporations which they formed, which, in the absence of fraud, have been sustained by the courts.

As shown by the articles of association, the Unthank Plow Company was organized for the purpose of engaging in the manufacture of plows and other agricultural implements, and also to acquire, purchase, and hold letters-patent, for such articles as it should engage in the manufacture of.

The contract to receive in payment the letters-patent, plows, material, and other assets of its predecessor, Unthank & Coffin, was, therefore, not *ultra vires*. *Lyon* v. *Ewings*, 17 Wis. 63; *Clark* v. *Farrington*, 11 Wis. 306; *Blunt* v. *Walker*, 11 Wis. 334; *Cornell* v. *Hichens*, 11 Wis. 353.

Does the fact that the property was received at an overvaluation, enable the receiver to maintain this suit without impeaching or setting the transaction aside, if it can be set aside? No proposition can be plainer, upon the facts as stated, than that the title to the property and assets which were transferred to the corporation passed to and remains in it, or in the receiver, and that the title and ownership of the stock thereby paid for vested in the defendant. The transaction having been, so far as appears, fully executed years before

the receiver was appointed, may he permit it to stand and now treat it as so far void as to ask for a new valuation of the property? May he disaffirm the contract in part, and affirm as to the residue? We have been unable to discover any principle or well considered authority which affirms this proposition.

The principle deducible from the authorities already cited is, that even in case of an overvaluation of property transferred to a corporation in payment of shares, the transaction, unless void for some reason, is binding so long as it is not impeached by the corporation, or its assignee; and it can be impeached only for fraud upon the corporation. *Coit* v. *Gold Amalgamating Co.,* 119 U. S. 343; *Phelan* v. *Hazard, supra; Brant* v. *Ehlen,* 59 Md. 1.

Thus it has been held that a mining corporation may issue shares to its creditors as fully paid up, in consideration of mining lands, and although these lands be greatly overvalued, the assignee in bankruptcy of the corporation can not, without disaffirming the contract, set up the claim that the property was not worth what it was valued at. *Foreman* v. *Bigelow, supra.* So in *Phelan* v. *Hazard, supra,* a case closely analogous in its facts to the one under consideration, Judge DILLON said: " While the contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat *that* as a payment which the parties have agreed should be payment."

A standard author concludes a careful and exhaustive examination of this subject thus: " The whole discussion resolves itself into the following conclusions: A corporation may take in payment of its shares any property which it may lawfully purchase. Such a transaction is not *ultra vires* or void, but is valid and binding upon the original share-takers and upon the corporation, unless it is rescinded or set aside for fraud. While such a contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat that as payment which the parties have

agreed should be payment." Thompson Stock., section 134. "Many attempts," says another learned author, "have been made, in cases where stock was issued for property taken at an overvaluation, to hold the party receiving such stock liable for its full par value, less the actual value of the property received from him. These attempts have not been successful. As already seen, the transaction is upheld as legal, valid, and binding on all parties and persons, unless there is an overvaluation, and that overvaluation is shown to have been fraudulent. When this is proved, then the contract is to be treated like other fraudulent contracts. It is to be adopted *in toto*, or rescinded *in toto* and set aside. Each party is to be restored as nearly as possible to their original positions. The property or its value is to be returned to the person receiving the stock, and he must return the stock or its real value. Its real value is ascertained, not by its par value, but by its selling market value." Cook Stock and Stockholders, section 47.

The contract, not being void, must be disaffirmed and set aside, before the receiver can maintain an action at law as for unpaid subscriptions. *Scovill* v. *Thayer, supra.*

Suppose it be true, that in consummating the arrangement, the property of Unthank & Coffin was turned in to the corporation at an overvaluation, and that the defendant and the other corporators participated in the alleged wrong. The transaction was the result of an agreement which the parties had the right as between themselves to make. Being corporators, they had the right to fix the amount of the capital stock. It was competent for them to estimate the value of their own property. The property was such as was suited to the proposed business of the corporation. Can the court now arbitrarily say that because they estimated their property too high, the defendant shall now be compelled to pay par for his stock, and yet take a price for his property which he never agreed to ? Shall he be capriciously punished, by being made liable *ex contractu*, upon a contract which he never made ? If

the defendant has participated in a fraud, whereby the cred-- itors of the corporation, who exercised ·ordinary business sagacity, have suffered damage, whatever redress such cred- itors may now obtain, while their representative retains the· defendant's property, must be sought by an action *ex delicto.*

In the case of *In re Baglan Hall Colliery Co., supra,* where a colliery had been turned over to a corporation in payment for· stock subscriptions, and where a question of overvaluation was made, Lord Justice GIFFARD said: " The test to be ap- plied is this: could the company by any proceeding have set aside the transaction by which it was arranged that the owners of the colliery were to have paid-up shares as the price of their interests in the colliery? * * * There is noth- ing in the evidence to show that any person has been de- ceived. * * The case is precisely the same as *Pell's ·Case,* * * and it must be held that the persons who subscribed the memo- randum of association have paid all that they were bound to· pay.· Creditors have no ground for complaint, for persons who ·are about to enter into transactions of magnitude with an indi- vidual, make inquiry into the state of his circumstances; and so, if they enter. into them with a limited company, it is their own fault if they do not inquire into the nature of the mem- orandum and articles, and look to the register of share- holders."

Examination of the articles of the corporation here in- volved would have disclosed that the business of the com- pany was the manufacture of plows and other implements, and to acquire and own patent rights.

The register of stockholders doubtless would have dis-- closed to any one examining it, that the stock subscribed had been paid up. Inquiry doubtless would have disclosed the manner of payment. The solvency of the company de- pended then upon the nature and value of its property and assets. If there was no fraud or concealment after the trans-- action in question was consummated, it is not perceived how the creditors were defrauded by reason of an overvaluation

of the property, which was turned over in payment of the stock, any more than they would have been if the subscribers had paid in cash for their stock, and the corporation had then invested the money in patents and other property, which could now be shown was purchased at a price in excess of their value.

The fact is well.known that many of the corporate enterprises now in progress have been projected by persons who contributed their inventions, or their skilled services and experience in business at a fixed price, or perhaps what was rescued from the wreck of some previous enterprise, and nothing else, in payment of subscriptions to capital stock. It could not be tolerated, in the event of an adverse outcome, that, notwithstanding the utmost good faith may have been observed in making such contribution or payment, and in disclosing all the facts, creditors, who were in no way misled, could now, by simply asserting an overvaluation of what had been agreed upon and accepted as payment of subscriptions, enforce contracts which were never made.

Patent-rights and mining and manufacturing property, which are embarked in enterprises, are frequently valued by their owners and others at a prospective value, which may or may not be realized, dependent upon future contingencies. If the owners, who put such valuations thereon, act in good faith, and yet suffer disappointment, we can see no reason why they should suffer further, unless they have been guilty of fraud or concealment, which has resulted in damage to others.

Our conclusion is, that the complaint states no cause of action, and that the court erred in overruling the appellant's demurrer. This renders it unnecessary that we should consider other questions discussed.

Judgment reversed, with costs.

Filed March 18, 1887; petition for a rehearing overruled May 28, 1887.