Clow *et al. v.* Brown *et al.*

## CLOW ET AL. *v.* BROWN ET AL.

[No. 18,089.   Filed Jan. 4, 1898.   Rehearing denied April 1, 1898.]

CORPORATIONS.—*Liability of Directors for Corporate Debts.—Fraud.* —A corporation with a capital stock of $200,000.00 was organized for the construction and operation of a system of water-works for a city.   Three persons who were its sole incorporators became its directors.   Although the company had been organized more than eighteen months, no part of the capital stock was paid in or collected, except that the three organizers subscribed for shares to the amount of $3,000.00, which were paid by allowance to them of that sum for their services as promoters in the organization of the company, and except that the company issued its bonds in the sum $150,000.00, secured by a mortgage on the property which it should afterwards acquire, by which to procure funds for the construction of the water-works.   The company contracted with a firm to construct the water-works, and, in compensation therefor, turned over to said firm the $150,000.00 bonds, and also issued to said firm the remaining capital stock of the company to the amount of $197,-000.00.   There was a secret understanding between the contracting firm and the directors that the firm was to pay one of the directors $6,000.00 in cash, and to assign to each of the other directors $20,-000.00 of the capital stock.   This secret understanding was carried out.   For the extension of the water-works system the company contracted a debt of $4,015.19, which was not paid.   Afterwards, on foreclosure of the mortgage given to secure the bonds, the whole plant was sold for $107,500.00.   The corporation published no annual report, as provided by section 5071, Burns' R. S. 1894. *Held,* in an action to recover the indebtedness of $4,015.19 incurred in extending the system of water-works, that the directors were personally liable.   *pp. 186-197.*

CORPORATIONS.—*Failure to Publish Annual Report.— Liability of Directors.—Complaint.*—In an action against the directors to recover a debt of the corporation, where the corporation has become insolvent, a cause of action is stated in a complaint which alleges the insolvency of the corporation, the failure to publish the annual report, and that the plaintiffs were misled and damaged thereby. *p. 198.*

PLEADING.—*Indefinite Complaint.—Demurrer.*—A demurrer does not raise the question as to whether or not a complaint is sufficiently definite. *p. 199.*

From the Montgomery Circuit Court. *Reversed.*

*P. S. Kennedy, S. C. Kennedy* and *Dumont Kennedy,* for appellants.

*Benjamin Crane, A. B. Anderson* and *Charles Martindale,* for appellees.

HOWARD, C. J.—This is the third appeal in relation to the subject-matter in controversy between the parties. *Clow v. Brown,* 134 Ind. 287; *Bruner v. Brown,* 139 Ind. 600. In the case now before us the appellants filed their complaint in six paragraphs, the second of which was afterwards withdrawn; and the court sustained a demurrer to each of the others. The ruling on the demurrer presents the only questions for our consideration.

From the first, third, and sixth paragraphs of the complaint, it appears that in the year 1885, under authority of the act for the organization of manufacturing, mining, and other companies (section 5051, Burns' R. S. 1894, 3851, Horner's R. S. 1897, and following sections), the appellees organized a company for the construction and operation of a system of water-works for the city of Crawfordsville, and were duly chosen as directors of said company; that the amount of capital stock was fixed at $100,000.00, afterwards increased to $200,000.00; that after the putting in of the water-works plant, the company purchased of appellants certain water pipes, mains, etc., for which, on September 23, 1889, appellants recovered judgment

in the sum of $4,015.19, which has never been paid; that the company violated the law under which it was organized in many particulars named, to .wit, it did not within eighteen months after organization proceed to collect, and has never collected, any part of the designated capital, except that the appellees subscribed for shares to the amount of $3,000.00, which were paid for by allowance to them of that sum for their services, as promoters in the organization of said company, and except that the company issued its bonds in the sum of $150,000, secured by mortgage on the property which it should afterwards acquire, by which to procure funds for the construction of the water-works; that the company entered into contract with a firm known as Comegys and Lewis, to construct said water-works and operate them for one year, and, in compensation therefor, turned over to said firm said $150,000.00 bonds, and also issued to said firm the remaining capital stock of the company, to the amount of $197,000.00; that the expenses and labor in the construction of the works were wholly paid out of the money realized on the sale of said bonds, and said stock so issued to said firm was of no value, for the reason that nothing was ever paid on it; that the company never had any assets except the plant so built and equipped out of the proceeds of said bonds; that, in 1891, the mortgage securing said bonds was· foreclosed, and the works were sold for $107,500.00; that the appellees were the sole directors of said company during the whole time when the acts and omissions complained of occurred, and by reason of which acts and omissions the company became and is wholly insolvent; that appellees, at the time of contracting the debt due appellants, and at all other times since the issue of the said $150,000.00 bonds, knew that the company was insolvent. And it is alleged that, by

reason of said acts and omissions of said company and of appellees, a right of action has accrued under said statutes in favor of appellants against appellees as directors.

In the fourth paragraph of the complaint, it is further alleged that, at the time the appellants sold the water-pipes and mains to the company they had no knowledge of the company's insolvency; that said company and all of said directors, from the organization of said company to the present time, failed and neglected to make and publish the annual report required by statute, showing the amount of the capital stock of the company, the amount of the assessments thereon made and paid in, and the amount of the indebtedness of the corporation, in consequence of which failure and neglect so to publish such report appellants had no knowledge of the financial condition of the company, and they were thereby misled and deceived into the belief that said company was solvent and able to pay all debts which it might contract; that at no time since appellants' debt was contracted has said company had sufficient means with which to pay said mortgage indebtedness; and that, had appellants known of the said financial condition of the company, they would not have sold to it the material for which they are here seeking payment.

. In the fifth paragraph of the complaint, additional allegations are made, as follows: That in October, 1885, the appellees entered into a written agreement with the city of Crawfordsville to build a system of water-works for which the city was to pay a rental of $5,000.00 a year for 125 hydrants, and $30.00 a year for each additional hydrant; that about the same time appellees, for the purpose of building said works, agreed among themselves to form a corporation with a capital stock of $100,000.00, of which stock each of

appellees should receive $1,000.00, in paid up stock as compensation for their services in forming such organization; that on the completion of said organization appellees were chosen sole directors, and as such issued to themselves each said $1,000.00 of stock as paid up, but no payment except such services has ever been made for such stock; that on November 30, 1885, the appellee Martindale transferred his said stock to his son, without consideration, and resigned as director, and entered into a contract with the remaining directors to build said works for $127,000.00 of the paid up stock and $120,000.00 of the first mortgage bonds of the company, but with the understanding and agreement that said Martindale was not himself to build said works, but should sell said contract for the benefit of all the appellees; that on March 15, 1886, the capital stock was duly increased to $200,000.00, and an issue of $150,000.00 mortgage bonds ordered for the purpose of raising funds to build the works; that on the same day the contract with Martindale was annulled, and a new contract entered into with him, according to which he agreed to build the works for the $150,000.00 bonds and $197,000.00 of the paid up stock of the company, it being understood, as before, that Martindale was not himself to build the works, but was to sell the contract for the benefit of all the appellees; that on April 13, 1886, the appellees procured the firm of Comegys and Lewis to take said contract, with the secret understanding had by said firm with appellees that Martindale should be paid $6,000.00 for procuring said contract for them and that $20,000.00 of said capital stock should be assigned to each of the other appellees, Brown and Pierce, which money was paid and stock assigned by said firm to appellees in accordance with such secret understanding and agreement; that

Comegys and Lewis had no intention of paying anything for said $197,000.00 of capital stock, and knew that said water-works when built would be of much less value than the amount of the mortgage bonds encumbering the same; that the appellees Brown and Pierce each accepted his $20,000.00 of said stock, and continued to hold and vote the same knowing that nothing had ever been paid for it; that, on the completion of said works, they were turned over to said corporation, and said firm was released of all further liability; that nothing has ever been paid for any of said $197,000.00 stock by said firm, or by any one else; that, at the time appellees accepted said works as so completed, they knew that the same did not exceed in value $100,000.00, and that they were encumbered by said mortgage of $150.000.00; that afterwards the city of Crawfordsville, as it had a right to do under its contract with appellees, ordered an extension of said works, whereupon appellees purchased of appellants, on credit, the material for which payment is here sought, and for which judgment was entered in favor of appellants for $4,015.19, which judgment is in full force and unpaid; that, in consequence of said acts and omissions of appellees, said company is now, and has been insolvent from the 13th day of April, 1886, and has at no time had any property subject to execution, except that so encumbered as aforesaid; by reason of all of which an action has accrued in favor of appellants against appellees.

From the facts set out in the complaint, it cannot be a matter of doubt that the appellees, as sole promoters, incorporators and directors of the Crawfordsville Water-works Company, proceeded in utter disregard of many of the strict requirements of the statutes in such cases made and provided. The annual report, required by section 13 of the act (section 5071, Burns'

R. S. 1894; 3863, R. S. 1881), showing the amount of capital, amount of assessments made on capital and paid in, and the amount of indebtedness of the company was never published. Neither was the capital stock, as required by section 8 of the act (section 5060, Burns' R. S. 1894, 3859, R. S. 1881), or any part of it. paid into the treasury within eighteen months after the organization of the company, or at any other time, unless such payment was made as to $3,000.00 by issue of so much paid up stock for services of the promoters, or as to the remainder of the stock by the issue of the same to Comegys and Lewis. As to the $3.000.00 paid up stock issued to the appellees to pay them for their services as promoters, it may be, according to the reasoning and authorities in *Bruner* v. *Brown, supra,* that the issue can be held lawful, although, in strictness, what was decided in that case is, merely, that a corporation has the right to pay its promoters for such services.

The facts as shown in this case are quite different from those disclosed in *Bruner* v. *Brown,* and that case cannot therefore control the decision here. It appears here that the incorporators knew that the works could be put in for much less than the money to be realized from the sale of the $150,000.00 bonds, and that they were in fact put in for far less than that sum; and that when the mortgage was foreclosed, and after the works had been extended, and appellants' pipes and mains had been added to the original plant and sold with it, the whole brought but little over $100,000.00. The throwing in of the $197,000.00 capital stock seems to have been made and accepted as a mere gratuity. Indeed it is alleged that the stock when turned over was of no value, as must indeed have been true since nothing had been paid on it. No doubt the appellees, constituting as they did

the whole company, might, as to themselves and the corporation, make a gift of the stock. They could not complain of their own act. But the representation of this stock to the world as paid up, when the payment made was a mere fiction, was nothing short of an imposition upon all those who might deal with the company in good faith.

The statute already cited, section 5060, Burns' R. S. 1894 (3859, R. S. 1881), which requires that "The capital stock, as fixed by such company, shall be paid into the treasury thereof, within eighteen months from the incorporation of the same," means what it says. A sham payment, such as made in this case, was certainly never intended. Incorporators have no right to display an array of paid up stock before the eyes of the public, unless money or property, dollar for dollar, stands behind each share of stock so held out to the world as paid up. If the incorporators cannot afford to pay up all the stock, and can not dispose of it for value, then the shares should be diminished to the number which can be paid up within the time prescribed by the statute, instead of being unduly increased as they were in this case. The capital stock should be, what its name implies, an actual capital, by means of which the business may be carried on, and dealers with the concern made secure from loss.

No doubt, as held in *Coffin* v. *Ransdell*, 110 Ind. 417, property of a kind used and needed in a business may be taken in exchange for capital stock. But this must be real, and not a sham transaction. As also said by Judge Mitchell in that case: "That subscriptions to the capital stock of a corporation are required to be made in good faith, cannot be doubted. Simulated subscriptions by persons who have neither the ability or purpose to pay, and arrangements between the subscribers and the agents or promoters of a cor-

poration, that subscriptions shall be merely color-able, are a fraud upon the law.   This much was de-cided in the recent case of *Holman* v. *State, ex rel.*, 105 Ind. 569.

"The legislative purpose in making provision for corporate organizations was, that subscriptions to the capital stock should constitute a fund, or capital, with which to purchase property necessary for the cor-porate business, and to enable the corporation to en-gage in and carry out the purpose of its organization. It is upon the faith of its capital stock, either paid in and invested in available property and corporate as-sets, or to be paid in, that credit may be extended to the corporation.   Having paid, or agreed to pay, their subscriptions for stock, is the consideration upon which the several corporators enjoy exemption from personal liability for corporate debts, except as such liability may be imposed by statute.

"It follows necessarily that unpaid subscriptions to the capital stock of a corporation constitute a trust fund for the benefit of creditors; and it follows also, that the officers of the corporation, who are trustees in respect to its property and funds, cannot purposely and fraudulently waste or dissipate the corporate as-sets, nor can they defeat or impair the trust, by ac-cepting merely simulated or fictitious payment of stock subscriptions, or by any other device short of an actual payment of that which is in good faith taken as an equivalent for the stock.   *   *   *   Any arrangement, therefore, between a stockholder and the officers or agents of a corporation, by which paid-up shares of stock are issued upon merely simulated or nominal payment, whether such payment be made in money or property, is regarded, as between the stockholders and the creditors of the corporation, as a

sham, and hence no payment at all. Such payments, like simulated subscriptions, are an evasion of the law, and are therefore fraudulent and void."

In *Gates* v. *Tippecanoe Stone Co.* (Ohio), 48 N. E. 285, the supreme court of Ohio, while holding that "subscriptions to the stock of a corporation are *prima facie* payable in money," and that "neither the constitutional provision on the subject of corporate dues [similar to Art. 11, section 14, of our constitution], nor the statutes of the state, contemplate any other mode for their payment;" yet admits that payment for such stock may be made in specific property, provided only the parties to the transaction deal with each other at arm's length and in good faith, and provided other stockholders and creditors do not suffer. But good faith between the immediate parties to such a contract is not of itself sufficient to prevent the transfers of stock from becoming a fraud upon innocent third parties. The fact that the corporation is held out to the world as having capital stock paid in to an amount greatly in excess of the true amount paid, is a palpable fraud upon all who deal with the corporation in ignorance of the real situation.

In the case before us, as we have seen, no payment whatever was made on the $197,000.00 capital stock. The works were wholly built on borrowed money, and for much less than the proceeds of the bonds issued therefor. The stock passed to the contractors as a mere gratuity. More than this, the fifth paragraph of the complaint shows that in the contract with Comegys and Lewis an understanding was had by which $40,000.00 of the stock was divided between the appellees Brown and Pierce, while Martindale received $6,000.00 in cash. By no process of reasoning can it be shown that by such a scheme the directors could rightfully come into possession of so called

"paid-up stock" without in fact paying anything for it. Even, therefore, if the transfer of stock to the contractors could by any means be defended, that to the directors themselves, through the contractors, must remain wholly indefensible. Instead of providing for thus indirectly giving stock to themselves as paid-up, the directors might as well have taken possession of a part of the stock in the first place, and named it "paid-up capital," and then have turned over the remainder to the contractors, and given it the same name. That was the end reached by the roundabout proceeding, all the steps of which were, in effect, but parts of a single transaction. No one would say that the directors might vote themselves stock without paying for it; and what might not be done directly the law will not permit to be done indirectly. Yet, by this indirect, quite the same as by the most direct, transfer, the appellees came into possession of so called "paid-up stock," without having paid anything for it. While holding and voting this sham stock, these directors, without ever having contributed anything to the capital of the company, participated in the $5,000.00 yearly rental paid to the company by the city. They did more. By obtaining material on credit from appellants, they extended the works, thus receiving additional income, and then suffered appellants' property to be sold in part payment of the previous bonded indebtedness of the company. This was doing business without any actual capital, and, at the same time, holding out to the world $200,000.00 of sham stock as fully paid-up, thereby inducing confiding third parties to give credit to the wholly insolvent company. The series of transactions, from beginning to end, was a fraud upon the corporate laws of the State. There can be no doubt that the complaint shows a good cause of action. *Clow* v. *Brown, supra.*

The appellees knew that the company was hopelessly insolvent, made so by their own act in the sale of the $150,000.00 bonds, issued, not on any property then owned by the company, for it had none, but on property thereafter to be acquired by the sale of the bonds. They knew that every item of company assets was buried beyond redemption under the mortgage securing the bonds. They knew also that the $200,000.00 shares of professedly paid-up capital stock were utterly worthless, not a cent having been received from their sale. And yet, knowing all this, they proceeded deliberately to purchase upwards of $4,000.00 worth of material on the credit of the rotten concern. Such a taking of property under the forms of law ought not to be tolerated by any court.

Appellees, as we have seen, failed to make and publish the annual report required by section 5071, Burns' R. S. 1894 (3863, R. S. 1881). For this violation of the statute no excuse is offered. Had the report been made, showing the absolute insolvency of the company, it can hardly be doubted that no one would have extended credit to the corporation, and appellants would not have suffered the loss of their material. As the capital stock was never paid for, as required by section 5060, Burns' R. S. 1894 (3859, R. S. 1881), it is clear that there could not be a certificate of such payment filed in the office of the clerk of the circuit court, as required by section 5062, Burns' R. S. 1894 (3861, R. S. 1881). Counsel for appellees however say in their brief that the court will presume that such certificate was filed "stating the amount of the capital so fixed and paid in *and the manner in which the same has been paid in.*" But it is not true that such is the certificate required by said section of the statue. The certificate required is one "stating the amount of the

capital so fixed and paid in," and nothing as to any "manner" of payment. So, if there were a notice filed showing that the capital stock had been turned over to the contractors and two of the directors as paid-up stock, that would not be the certificate required by law, and the one which appellants, as well as the court, might presume had been filed. The certificate should be one stating simply that the capital stock had been paid in. But the complaint shows that the stock never was paid in and consequently that the certificate required by law could never have been filed.

Section 5076, Burns' R. S. 1894 (3868, R. S. 1881), reads: "If any company organized and established under the authority of this act, and of the act to which this is supplementary, shall violate any of the provisions thereof, and shall thereby become insolvent, the directors ordering or assenting to such violation shall jointly and severally be liable, in an action founded on said acts, for all debts contracted after such violation as aforesaid." Under this section, and by reason of the facts alleged in the complaint, the appellees are clearly liable for the debt contracted in favor of appellants. The insolvency of the company is the undoubted result of violations of the statutes in question, ordered and assented to by appellees, as directors of the company. The judgment is reversed, with instructions to overrule the demurrers to the complaint, and to each paragraph thereof, and for further proceedings not inconsistent with this opinion.

McCabe, J., took no part in the decision of this case.

## On Petition for Rehearing.

Howard, C. J.—The learned counsel for appellees do not question the correctness of the conclusions

reached by the court as to the sufficiency of the first, third, fifth, and sixth paragraphs of the complaint; but they say that, as to the fourth paragraph the opinion is erroneous. This contention is undoubtedly the result of a misapprehension of the scope and meaning of one of the concluding paragraphs of the opinion, to wit: "The insolvency of the company is the undoubted result of violations of the statute in question, ordered and assented to by appellees as directors of the company." Counsel do not deny that this statement is correct, in so far as it applies to the facts stated in all the paragraphs of the complaint except the fourth. The sufficiency of the fourth paragraph, however, was considered by itself, inasmuch as that paragraph is based upon sections 5060, 5062, 5071, 5073, Burns' R. S. 1894 (3859, 3861, 3863, 3865, R. S. 1881), which relate to payment of stock and publication of financial condition of company. Under these sections of the statute, the fourth paragraph of the complaint states a good cause of action. By the last of these sections the officers are made liable "if they shall fail to give such notice or make such report, and any person or persons shall be misled or deceived by such false report or certificate or on account of such failure to make such report, and damaged thereby." The fourth paragraph of the complaint alleges the insolvency of the company, and the failure of appellees to publish the notice required, and that appellants were "misled and deceived by such failure to publish such notice," and were damaged thereby in the manner stated. While it is true that the insolvency of the company was caused by violations of the statutes on the part of appellees, as set out in the first, third, fifth, and sixth paragraphs of the complaint, for which appellees incurred the liability prescribed in section 5076, Burns' R. S. 1894 (3868, R. S. 1881), yet that does not

relieve them of liability, also, for failure to make the publication prescribed in section 5073, Burns' R. S. 1894 (3865, R. S. 1881), as set out in the fourth paragraph of the complaint.   Of course the failure to publish the report was not a cause of the insolvency of the company, but it was a cause of damage to appellants, for which they had a right to recover.   That the fourth paragraph of complaint may not have been sufficiently definite, as claimed by counsel, on authority of *Niles* v. *Dodge,* 70 Ind. 147, was not a reason for sustaining the demurrer, whether it might have justified a motion to make more specific or not. Whether it was sufficiently specific, we need not and do not decide.   *Rodgers* v. *Baltimore, etc., R. W. Co., post,* 398.

Petition overruled.