GEORGE W. McCLURE, Appellant, v. PADUCAH IRON COMPANY et al., Respondents.

St. Louis Court of Appeals, December 3, 1901.

1. Jurisdiction: PLEA TO JURISDICTION: PRACTICE, TRIAL: PRACTICE, APPELLATE. Where evidence was taken on the plea to the jurisdiction, and it was overruled by the circuit court, the judgment is conclusive and the point can not be examined on its merits in this collateral proceeding.

McClure v. Paducah Iron Co.

2. ——: ANSWER. The filing of an answer is a general appearance, and gives the court jurisdiction over the person whether it had been properly obtained before or not.

3. Corporations: LIABILITY OF STOCKHOLDERS DETERMINED BY THE JURISDICTION. The liabilities of stockholders in a corporation should be determined according to the rule prevailing in the State, which has created the corporation.

4. Fraud as to corporation creditors. Actual fraud as to corporation creditors, that is, a preconceived and cherished purpose to swindle them in the capitalization of a company, is not necessary to render stockholders liable.

5. ——: ——. When property is turned into the corporation in payment of its shares, under whatever scheme at an overvaluation, to the knowledge of the contracting parties, this will be evidence of fraud such as will render the shareholders liable to make good to creditors of the corporation the difference between the par value of the shares and the real value at which the property was turned in.

6. ——: ——. In the case at bar, the respondents, as officers of the Paducah Iron Company, or as promoters of it, were bound to exercise their judgment and discretion honestly in the sale of its shares; their position as directors was one of trust and confidence; they owed the duty of conscientious fidelity to the public and could not disregard it in buying and selling their own property. They bought shares from the Nova Scotia Company for fifty thousand dollars for which they claim to have traded a furnace worth twice that sum shortly before, and whatever less than par the iron company's stock was worth, must have been caused by the overvaluation of the furnace.

7. ——: ——. In the case at bar, it is evident that the stock of the respondent has not been fully paid, that their subscriptions have only been partially paid, and that enough remains due on them to satisfy the demand of plaintiff.

Appeal from St. Louis City Circuit Court.—*Hon. Selden P. Spencer,* Judge.

REVERSED AND REMANDED *(with directions).*

STATEMENT OF THE CASE.

This is a creditor's bill against certain stockholders of an insolvent corporation. In the year 1887, the Paducah Land, Coal & Iron Company was organized under the laws of Kentucky with an authorized capital stock of three million dollars, of which ten per cent was paid. When referred to it will be styled the "land company." None of the individual defendants had anything to do with it, but were drawn into a collateral enterprise which it promoted. They were at the time stockholders in the Nova Scotia Iron Company, a Missouri corporation, which owned a blast furnace near Salem, in Dent county. The land company was anxious to obtain such a furnace to erect at Paducah in prosecution of its enterprise, which contemplated the establishment of an iron industry in that city to reduce the ore expected to be mined from lands which it owned or controlled in Tennessee. Suburban property, which it was expected would be enhanced in value by the iron works, was to be purchased by said land company and sold afterwards at a profit. Hugh Mulholland, the land company's vice-president, learned from a St. Louis iron broker about this Dent county furnace, that it was idle and could perhaps be purchased cheaply. At Mulholland's suggestion a committee consisting of himself and Thomas Hays, president of the land company, was sent to St. Louis to investigate the matter. Hays was a furnace expert, had been in the iron business in Alabama and Tennessee and had built and operated blast furnaces. Thomas J. Scott, who was superintendent of the Nova Scotia Iron Company's works, was called to St. Louis by a telegram to meet said committee. He described the property to Mulholland and Hays and the latter went with Scott and E. C. Lackland, at their request, to Salem and made an examination of the plant. The committee's report to the land company was that the furnace was in good

condition. This was true; the testimony shows it had been kept in good repair and could have been put in blast in forty-eight hours. It had lain idle for several years on account of an insufficient supply of ore and lack of transportation facilities, but there was evidence the Nova Scotia company intended to use it again as soon as a railroad, then in prospect, was built to Salem. Hays strongly recommended the purchase of the furnace by the land company. Negotiations ensued and Thomas Howard, president of the Nova Scotia company, and Scott, its secretary, went to Paducah and from there to Tennessee to examine the land company's ore banks. The result was an understanding between the owners of the Nova Scotia plant and the directors of the land company, which was as follows: another Kentucky corporation should be organized with a capital of two hundred and fifty thousand dollars, divided into shares of the par value of one hundred dollars each, to be known as the Paducah Iron Company. The land company was to subscribe for one thousand shares, pay seventy thousand dollars in cash for them and thirty thousand dollars in mineral lands to be conveyed to the iron company. Defendants Howard, Scott, Harrison and E. C. Lackland, all of whom were stockholders and directors in the Nova Scotia company, were also to subscribe for one thousand shares of stock and fully pay for them by turning over to the iron company, the Salem furnace. These four men, together with Thomas H. Hays, M. Bloom and George C. Thompson of the land company, thereupon incorporated under the Kentucky statutes on the eleventh day of January, 1888, as the Paducah Iron Company and were constituted its first directors. On the same day, the agreement between said incorporators in regard to their subscriptions for stock of the Paducah Iron Company and how they should pay for it, was set out in a written-instrument which they all signed.

The provisions of the instrument correspond with the agreement as above stated.

It appears from the books of the Nova Scotia company that its board of directors thereafter adopted a resolution which recited the aforesaid contract as having been made .in its behalf by its officers, and in behalf of the Paducah Land, Coal & Iron Company by the company's officers; that under said agreement the furnace and appurtenances were sold to the Paducah Iron Company in consideration of one thousand shares of stock which had been issued and delivered to the Nova Scotia Iron Company; that whereas the last-named company was largely indebted to R. J. Lackland, John W. Harrison and Thomas Howard for borrowed money, and whereas said parties were willing to accept said stock at fifty dollars per share on account of what the Nova Scotia company owed them, therefore the Nova Scotia company agreed to turn over the stock to them on that basis and authorized its president and secretary to have the necessary transfers made. In accordance with this arrangement, the Paducah Iron Company issued shares to the individual defendants in this action.

McClure, the plaintiff erected and equipped the blast furnace at Paducah for the Paducah Iron Company and afterwards recovered judgment against said company in the circuit court of the city of St. Louis for three thousand, six hundred and seventy-nine and ninety-four one-hundredths dollars and costs on account of said work. An execution was issued on that judgment and returned *nulla bona*. The Paducah Iron Company became insolvent.

This petition, in the nature of a bill in equity, seeks to collect the amount of McClure's judgment from the individual defendants as stockholders of the Paducah Iron Company on the ground that their stock is not fully paid because the furnace was put in at an overvaluation. The petition states the facts

as above recited and charges that the individual defendants, impleaded with the Paducah Iron Company, knew their shares had not been paid for either wholly or in part, in money or anything of substantial value, when they received them, and knew the furnace aforesaid was of no substantial value to the Paducah Iron Company and could not be made to be; but that the issuing of one thousand shares of stock for it was a fraudulent capitalization of said iron company, whereby it would hold itself out to the public and to persons invited to deal with it, as possessing a paid-up capital which it did not in fact possess, and whereby creditors would be entrapped and defrauded.

Much testimony was introduced as to the value of the furnace, the general purport of which was that if it had to be torn down and moved from Missouri to Kentucky, it had no value except as scrap iron and was not worth to exceed twenty thousand dollars. On the other hand, some of the defendants testified that it was worth what it originally cost, which was about one hundred and thirteen thousand dollars.

Such other facts as require comment will be stated in the opinion.

*Nathan Frank, Chas. W. Bates* and *Richard A. Jones* for appellant.

(1) A cause of action against a non-resident stockholder of a foreign corporation, for unpaid assessments on its capital stock, exists wherever he can be found. Howorth v. Lombard, 175 Mass. 570; Iron Co. v. Brown, 68 N. Y. S. 141; Whitman v. Bank, 176 U. S. 565; Bank v. Baker, 176 Mass. 297. (2) The liability of stockholders to pay for stock subscribed for is distinctively contractual. Guerney v. Moore, 131 Mo. 672; Rehbein v. Rahr, 85 N. W. 315; Whitman v. Bank, 176 U. S. 563. (3) If it were necessary

to join the corporation as a defendant, in cases like the one at bar, creditors of the corporation would often be without remedy, for creditors might not be able to find the stockholder where service could be had on the corporation. The Paducah Iron Company not being able to dispute the jurisdiction of the court in the original action, neither can any of the stockholder defendants in this suit. Guerney v. Moore, 131 Mo. 650. (4) The liability of defendants as stockholders of Paducah Iron Company depends upon the law of Kentucky, the State in which the corporation was organized. Leucke v. Tredway, 45 Mo. App. 507; Guerney v. Moore, 131 Mo. 650. The statutes of Kentucky, under which the Paducah Iron Company was incorporated, provided: "Par. 14. Nothing herein shall exempt the stockholders of any corporation from individual liability to the amount of the unpaid installments on the stock owned by them, or transferred by them, for the purpose of defrauding creditors, and an execution against the company may, to that extent, be levied upon the private property of such individuals." General Statutes of Kentucky, ch. 56. (5) In Bush v. Robinson, 95 Ky. 492, the corporation was organized under the general statutes of Kentucky, chapter 56. This statutory liability of the stockholder is contractual and may be enforced in any State where service can be had on the stockholder. Leucke v. Tredway, 45 Mo. App. 507; Guerney v. Moore, 131 Mo. 650.

*T. A. Post* and *Smith P. Galt* for respondents.

(1) The presumption is, the court finds, and plaintiff concedes, that, in sale of the Salem furnace property to the Paducah Iron Company for $100,000, there was no element of positive fraud, and no attempt is made to set the sale aside for such reason. "There is no question of actual fraud or

moral wrong in the case." (Opinion of Justice Spencer, plaintiff's abstract.) (2) Presumptively, and in the absence of fraud, the price agreed on by the parties to the sale of the Salem furnace, established its value for the purposes of that sale, and the only way to upset that presumption would be testimony showing that the parties could not reasonably have estimated $100,000 as the value of the furnace to the Kentucky syndicate. The assault on the sale made by plaintiff, through all of his painstaking and wearisome detail of testimony, has been based on a false theory, viz., that the value of the Salem furnace, for the purposes of its purchase and re-erection in Paducah, is to be ascertained by computing the cost of the different items of labor and material, machinery and appliances, etc., which went into the construction of the plant at Salem, and deducting therefrom shrinkage in values, and costs of transportation and re-erection in Paducah. (3) From an examination of the evidence the court will find it impossible to say, in view of all the circumstances, that the furnace, at the date of its sale, might not fairly have been computed to be worth in Paducah, to the new company, $100,000.

GOODE, J.—I. A plea to the circuit court's jurisdiction over the Paducah Iron Company was interposed in the original action instituted by the plaintiff, to recover the balance due him for his work in erecting and equipping the Paducah plant, on the ground that said company was a Kentucky corporation, having no office, place of business or business representative in this State. Evidence was taken on the plea and it was overruled by the circuit court, whose judgment is conclusive and the point can not be examined on its merits in this collateral proceeding. Baisley v. Baisley, 113 Mo. 544; Reed v. Nicholson, 158 Mo. 524.

II. A plea to the jurisdiction over the Paducah Iron

McClure v. Paducah Iron Co.

Company was likewise preferred in this case; but it was done in respondent's answer to plaintiff's amended petition, after said iron company had joined with several other defendants in a denial of the allegations of the original petition without raising a jurisdictional point. The filing of that answer was a general appearance by the Paducah Iron Company and gave the court jurisdiction over it whether it had been properly obtained before or not. Shenan & Lowler Transfer Co. v. Sims, 36 Mo. App. 224; Orear v. Clough, 52 Mo. 55; Peters v. Railroad, 59 Mo. 406.

III. On one fundamental question, the numerous cases which treat of the liability of holders of corporate stock for balances charged to remain due on the par value of their shares, because they were paid for in property at an excessive valuation, are conflicting, namely; whether it is necessary in order to make a shareholder liable to a creditor of an insolvent company for the difference between the value of his property and the price at which it was put into the corporation, to show the property was knowingly and fraudulently overvalued in the trade; or whether it is sufficient to prove that in point of fact, and without regard to the motive of the parties, it was exchanged for shares at an exaggerated price? While the discrepancies among the authorities may be partially accounted for by attention to the facts, and sometimes also particular statutes on which the decisions turned, and with reference to which the reasons assigned for them were given, still, there remains a radical difference of opinion as to the principle on which the law governing such transactions should be moulded. Some courts are more concerned to protect persons, who deal with a corporation, against loss from having extended an undeserved credit to it on the strength of a nominal capital, which was fictitious in whole or in part because made up of overvalued assets; while others are chiefly impressed by the impolicy of granting relief

against contracts for the sale of corporate stock, or otherwise interfering with commercial exchanges, unless fraud is shown, which of course vitiates all transactions.    Different courts are controlled in their judgments in such cases, in the absence of legislation on the subject, by the comparative importance they attach to these two considerations.

The    decisions    are    logically    divisible    into    several classes:

First.    Those which hold that unless there is proof of fraud, the mere fact of an overvaluation of property of any kind paid by a subscriber for shares, does not render him liable over to either the company itself or its creditors, for an unpaid balance.    This is the doctrine of all the English and most of the American courts and is supported by many precedents, of which the following are good examples: · In re Raglan Hall Colliery Co., L. R. 5 Ch. 346; Coit v. Gold Amalgamating Co., 119 U. S. 343; Schenck v. Andrews, 57 N. Y. 133; Douglass v. Ireland, 73 N. Y. 100; Van Cott v. Van Brunt, 82 N. Y. 535; Brandt v. Ehlen, 59 Md. 1; Mallinchrodt v. Glass Co., 34 Ill. App. 404; Phelan v. Howard, 5 Dill, 45; Vail v. Phillips, 14 N. J. L. 45; Bickley v. Schlag, 46 N. J. Eq. 533; Coffin v. Ramsdell, 110 Ind. 417; Troup v. Norbach, 53 Neb. 795; Young v. Erie Iron Co., 65 Mich. 111; Kroenert v. Johnston, 19 Wash. 96; Kelly v. Fourth of July Min. Co., 42 L. R. A. (Mont.) 621; Medler v. Albuquerque Hotel Co., 6 N. M. 331; Smith v. Prior, 58 Minn. 247; American Tube Co. v. Baden Gas Co., 165 Pa. St. 489; Roller Mill Co. v. Ferrell, 43 U. S. App. 452; Northwestern Mut. Life Ins. Co. v. Cotton Ex. R. E. Co., 70 Fed. Rep. 55; Whitehill v. Jacobs, 75 Wis. 479; New Haven Horse Nail Co. v. Linden Spring Co., 142 Mass. 349; Kelly Bros. v. Fletcher, 94 Tenn. 1.

Second.    Those holding that if property of substantial value is grossly overestimated in an exchange for stock, that

fact establishes fraud or raises so strong a presumption of it as to justify a court in finding it existed, unless there is satisfactory rebuttal evidence. Some cases seem to treat the presumption as conclusive. Boynton v. Andrews, 63 N. Y. 93; Carr v. Le Fevre, 27 Pa. St. 413; Osgood v. King, 42 Ia. 478; Lloyd v. Preston, 146 U. S. 630; Gogebic Invest. Co. v. Iron Chief Mining Co., 78 Wis. 427; Coleman v. Howe, 154 Ill. 458; Addison v. Pacific Coast Mill. Co., 79 Fed. Rep. 459; Hill v. Coal & Mining Co., 124 Mo. 153; Pickering v. Townsend, 118 Ala. 35; Wallace v. Carpenter Elec. Heating Co., 70 Minn. 321; Manhattan Trust Co. v. Seattle, etc., Co., 16 Wash. 499. It is obvious that these cases are entirely consistent with those in the first group. The judgment in both classes turns on the presence or absence of actual fraud in the transaction; the only difference being in the proof required to establish its presence.

Third. Instances in which the worth of the property accepted by the company was wholly prospective or speculative, it being without a market value at the time it was exchanged for stock. In such cases, some courts hold that because of the absence of any present value for the property, no payment was made on the shares at all, and that a company creditor may collect their par value from a subscriber; others make no distinction between these cases and those where property of substantial value was given, but inquire into the motives and good faith of the parties in either instance. This group is exemplified by Chisholm v. Fornet, 65 Ia. 333; Alling v. Wenzell, 27 Ill. App. 511; Salt Lake Hardware Co. v. Tintic Mill, 13 Utah 432; Graves v. Brooks, 117 Mich. 424; Lake Superior Iron Co. v. Drexel, 90 N. Y. 87. Paying for shares by inventions and patent-rights, supposed to be valuable but as yet untried, has caused much litigation of this sort.

Fourth. Cases in which the corporation and the subscribers had agreed that full-paid stock should be issued on payment of less than its par value. When that is done, stockholders are always held liable to corporate creditors, for such an arrangement impeaches itself. Chouteau v. Dean, 7 Mo. App. 210; Kehlor v. Lademann, 11 Mo. App. 550; Scoville v. Thayer, 105 U. S. 143.

Fifth. Those in which the question of good or bad faith is ignored and the stockholder held responsible solely from the fact that the actual value of the property he gave for his shares, as ascertained by a court or jury from evidence *aliunde,* was less than the face value of the shares. Steam Stone Cutter Co. v. Scott, 157 Mo. 520; Van Cleve v. Berkey, 143 Mo. 109; Shickle v. Watts, 94 Mo. 410; Luecke v. Tredway, 45 Mo. App. 507; Farmers Bank v. Gallaher, 43 Mo. App. 432; Elyton Land Co. v. Birmingham, etc., Co., 92 Ala. 409. Most, if not all, the cases in this group might appropriately be classified under either the second or third class, but for the ground on which the opinions place the subscriber's liability. In every one we have examined, the article, franchise or other property exchanged for stock, was either grossly overestimated or had only prospective value. The opinions, however, do not rest the judgment on that circumstance, but on the simple fact of overvaluation. In Van Cleve v. Berkey, the court says: "It is the duty of the stockholder and not of the creditor to see that it (the stock) is so paid; hence, the inquiry in a case between the creditor and a stockholder, when property had been paid in for the capital stock of a corporation, is not whether the stockholder believed, or had reason to believe, the property was equal in value to the par value of the capital stock, but whether, in point of fact, it was such an equivalent." That language unmistakably announces the rule that good faith in a transaction between the company and one who pays for his shares

in something else than cash, is immaterial; or, at least, not decisive of the question of the purchaser's responsibility. So stringent and extreme an obligation is imposed, we believe, only in jurisdictions where constitutional or statutory provisions exist similar to the one contained in the Constitution and statutes of Missouri, prohibiting the issuing of stock "except for money paid, labor done or property actually received;" though it is not quite clear why such a provision should affect the matter. The right to pay for stock in property exists at common law, and such enactments contain no terms explicitly imposing the duty on a purchaser to see that his property is worth the face value of the stock he receives for it, or do more than was always required of him; that is, act honestly in the trade. But the courts in seeking to give efficacy to legislation of this kind, do, unquestionably, hold a buyer of shares to a stricter accountability than they otherwise would, and plant their rulings on the statute or Constitution, as the case may be. Van Cleve v. Berkey, supra; Elyton Land Co. v. Birmingham, etc., Co., supra. It may plausibly be claimed that such an interpretation best realizes the intention of the legislators, who were probably induced to enact the law because of the unscrupulous methods often resorted to by promoters and officers of companies, which have been a great public scandal and caused heavy losses, large nominal capitalizations often proving wholly illusory and destitute of genuine assets—financial mirages.

It is not easy to frame a perfect rule. On one hand lies the importance of protecting those who deal with companies, and have a right to rely on its capital stock, from being misled by simulated instead of real payments, and on the other of upholding, as far as possible, the right of a man to dispose of his property when he can, at what he and the party to whom he sells consider a fair price, whatever others may think. That privilege is of the very essence of the

*jus disponendi.*   Probably the wiser, as it is the most accepted rule, is the one which restricts the exchange of property for stock only in so far as is necessary to prevent fraud.   The spirit of trade strains toward unhampered activity, and restraints on it, beyond what are needed to secure honest dealing, are apt to prove pernicious and futile.   Creditors ought to be shielded against injury from fraudulent sales of corporate stock; but concern for them should not extend to authorizing courts to hold liable an honest subscriber, who has paid for his shares in good faith, in property, at what he and the officers of the company thought it was worth, because in the subsequent judgment of a judge or jury it was not worth that much.   Such a course compels a man to take less for his property than he values it at, and binds him by the uncertain opinions of others, based on testimony given long after the event.   Commenting on the effect of this rule, the Supreme Court of New York said in Schenck v. Andrews, 57 N. Y. 133:   "No person could be expected to become a stockholder and pay his money or appropriate his property and he nevertheless, be held liable to a contribution in favor of creditors to the extent of the stock issued for such property, if a jury could subsequently and at an indefinite and unlimited period thereafter, find that the trustees had, under a mistake, but in an honest exercise of their judgment, concluded erroneously, either that the property was in fact, as disclosed by subsequent events, not absolutely indispensable, or actually worth the full sum allowed for it.   There are many circumstances that affect values; the time of the purchase, the demand for the article sought for, a limited supply, the credit given, a panic in the money market and various other matters have their influence and effect which can not be properly appreciated at a remote day after these causes have ceased to operate."

A discussion of these views would not be necessary, or even appropriate, if the Paducah Iron Company was a domestic corporation and we were bound to determine the liability of the respondents according to the decisions in this State. As it is a Kentucky corporation, their liability should be determined according to the rule prevailing in that jurisdiction; but there are few decisions on the question in the Kentucky reports and we have been unable to find one which considers whether or not the stockholder's responsibility to corporate creditors, when he paid for his shares in property, is to be tested solely by the bona fides of the exchange. Stock may be paid for there, as here, in that mode, and the articles of association of the Paducah Iron Company expressly provide for such payment. Neither have we been referred to any statute or constitutional provision regulating at that time the right to so pay, as there is in Missouri. We must therefore decide the controversy according to the weight of authority elsewhere, but not necessarily by the rule in this State.

The issues are uncomplicated by any claim that the respondents were ignorant of the actual facts about the property exchanged for their shares, or its value. They were all either original subscribers to the Paducah Iron Company's capital and incorporators and promoters of that company, or interested in the enterprise from the first. The evidence convinces us that the furnace which they turned over to pay for one thousand shares of stock was not worth one hundred thousand dollars at the time, nor near that sum, and, hence, was not a fair compensation for the stock issued to them. It was a charcoal furnace and out of date, as the testimony shows that blast furnaces of that kind have been superseded by an improved design. The material of which it was composed was second-hand, it having been purchased by the Nova Scotia company from a concern in Grand Tower, Illinois.

While there was evidence that it cost about one hundred and thirteen thousand dollars in place at Salem, much of that sum represented labor and expense of shipment from Grand Tower. To be used at Paducah, it had to be dismantled, cut down rivet by rivet and transported from Salem there. To take it down and remove it to Paducah cost about ten thousand dollars; then thirty thousand dollars more, or thereabouts, were expended in modernizing it and erecting it on the new site; so that it finally cost the Paducah company about one hundred and forty thousand dollars. We do not lose sight of facts testified to by the attorney for the Paducah Land, Coal & Iron Company, that the necessity was urgent to get a blast furnace in operation as soon as possible and that the land company would have paid one hundred thousand dollars in cash for the Nova Scotia company's furnace if it had had the money. We weigh that testimony in connection with that of several competent experts who swore a new furnace of the latest pattern could have been put in place at Paducah for one hundred thousand dollars, and the other evidence as to the condition of the Nova Scotia company's furnace, its age, the length of time it had been used, the cost of dismantling it and taking it to Paducah and the additions and repairs which had to be made to put it in operation. We recognize the precept stated in Elyton Land Co. v. Birmingham, etc., Co., 92 Ala., supra, that where property is exchanged for stock, allowance ought to be made for honest differences of opinion as to its value; and also the rule laid down in Gamble v. Q. C. W. Co., 123 N. Y. loc. cit. 103, that "the inquiry should be what, under all the circumstances, is the fair value of the property considering the proposed use of it and the general purpose for which the company is organized." We know, too, how prices fluctuate with time, and that different persons are likely to disagree on the same evi-

dence as to the value of an article on a specified date, two or three years previous to the date they are called on to pass on the question.

But there are facts in this case which conduct inevitably to the conclusion that the individual respondents knew they were exchanging the furnace for stock at an exaggerated price. They, as stockholders and directors of the Nova Scotia company, sold it to the Paducah Iron Company for one thousand shares of stock and very soon afterwards transferred said stock to themselves at fifty cents on the dollar, in payment of debts the Nova Scotia company owed them. Moreover, they were part of the Paducah Iron Company themselves and were in effect dealing with themselves in the transaction. Howard, E. C. Lackland, Harrison and Scott, who made the exchange, were four out of seven of the incorporators of the last-named company and four out of seven of its directors when the trade was effected. In less than a month the Nova Scotia company voted to turn said stock over to Howard, Harrison and R. J. Lackland, at fifty cents on the dollar, and they, as stockholders and directors of the company last named, did the voting.

Much stress is laid by respondents on the fact that they did not initiate this transaction, but were sought by the directors of the Paducah Land, Coal & Iron Company for the purpose of buying the Nova Scotia company's furnace, and the further fact that they insisted on the committee sent by the last named company making a personal inspection of it, and therefore are shown to have been guilty of no fraud or bad faith in the transaction. This proposition we freely and fully concede. The entire negotiation was conducted by the respondents in an honorable manner; nor could the representatives of the Paducah Land Company claim they were in any way imposed on or defrauded. That circumstance weighed heavily with the learned circuit judge. But it is not

the vital point. There is no controversy here between the Paducah Land Company and the defendants. The controversy is between a creditor of the Paducah Iron Company and the shareholders of that company. However fair and just the conduct of the respondents was in dealing with the land company, they were organizers of the Paducah Iron Company, trustees of its capital stock, charged with the duty of seeing that it was fairly disposed of and responsible to the world to have cash, or property of equal value, realized by the sale of it. If there was anything false or deceptive in the apparent ability of said iron company to meet its obligations, respondents are as much to blame as anyone and answerable to any person damaged thereby.

All the authorities agree that actual fraud as to corporate creditors, that is, a preconceived and cherished purpose to swindle them in the capitalization of a company, is not necessary to render stockholders liable. The cases so hold which exonerate subscribers when they act in good faith toward the corporation in paying for shares. Responsibility to creditors fastens on them if they knew the property exchanged for stock was not worth what it was valued at in the trade. That constitutes legal or technical fraud and raises a claim in behalf of a creditor against the culpable shareholder. As was said by the Supreme Court of New York: "The fraud is consummated by the issue of its stock as full-paid stock which has not been fully paid, and it does not depend on any fraudulent intent other than that which is evinced by the act of knowingly issuing stock for property in an amount in excess of its value." Nat'l Tube Works v. Gilfillan, 124 N. Y. 302.

It has been well said also: "If there is any meaning at all in the proposition that subscribers to the shares of a corporation must pay for them either in money or in money's worth, and if this principle has any substance at all when

appealed to for the protection of those who have given credit to the corporation, it must follow that where property is turned in to the corporation in payment of its shares, under whatever scheme, at an overvaluation, to the knowledge of the contracting parties, this will be evidence of fraud such as will render the shareholders liable to make good to creditors of the corporation the difference between the par value of the shares and the real value at which the property was turned in." 2 Thompson on Corporations, sec. 1621; Boulton Carbon Co. v. Mills, 78 Iowa 460; 5 L. R. A. 649.

Cases very similar to this one, in which shareholders were made to contribute to pay the company's debts, are found in jurisdictions which steadfastly adhere to the good faith doctrine. In Boynton v. Andrews, 63 N. Y. 93, the capital stock of the company was one hundred thousand dollars, which was paid for by a steam engine, boilers, machinery and some personal property purchased by stock issued to one of the trustees. No witness estimated the value of the machinery at more than fifty thousand dollars. The trustee from whom it was purchased knew all about its value. Under these circumstances, the court said: "There could be no mistake or error of judgment in fixing the value of this particular property by its owner and, under the circumstances, it is manifest there was a plain case of overvaluation with full knowledge of the facts. Such a transaction is fraudulent in law on its face."

Certainly, these respondents, as officers of the Paducah Iron Company, or as promoters of it, were bound to exercise their judgment and discretion honestly in the sale of its shares. Their position as directors was one of trust and confidence; they owed the duty of conscientious fidelity to the public and could not disregard it in buying and selling their own property. They bought shares from the Nova Scotia company for fifty thousand dollars for which they claim to

have traded a furnace worth twice that sum shortly before. The Paducah Iron Company had just started and could have sustained no business losses; the land company had substantially paid for the shares it bought; hence, whatever less than par the iron company's stock was worth, must have been caused, by the overvaluation of the furnace.

In Addison v. Pac. Coast Mill Co., 79 Fed. Rep. 459, stock was issued to the amount of two hundred and fifty thousand dollars for a mill worth only one hundred and thirty-five thousand dollars. It was held a subscriber could not, under these circumstances, claim his stock had been paid.

So, where the directors of a corporation, knowing the value of their property, sold it to the corporation for shares at a price nearly twenty-five per cent above its value, the court treated the transaction as fraudulent and made them contribute. Northwestern Mut. Life Ins. Co. v. Cotton Ex. R. E. Co., 46 Fed. 42.

And likewise, where stock of the face value of three hundred and fifty thousand dollars was paid to members of a construction company for a debt of seventy thousand dollars. Jackson v. Fraer, 64 Iowa 469.

And where land of the value of not more than twenty-seven thousand five hundred dollars was put in to pay for shares amounting to one hundred and ninety thousand dollars, it was held the stock had not been paid. Osgood v. King, 42 Iowa 478.

A case arose in New Jersey very similar to the present one. The capital stock of a company was fixed at one hundred thousand dollars, all of which was subscribed by five persons, who became the directors. Certain lands were purchased for fifty thousand dollars and the deed thereto was made directly to the corporation, which gave its obligation for the entire purchase money. The directors then appraised the

land at one hundred thousand dollars and credited the fifty thousand dollars, over and above what the company had paid for it, as a payment of fifty per cent on their stock subscriptions. The lands were not worth more than their original purchase price and it was held against the incorporators of the corporation, at the suit of its creditors, that the credit on their stock subscriptions was invalid and they were liable for the whole amount of their subscriptions. Wetherbee v. Baker, 35 N. J. Eq. 501. That was a carefully considered case, not materially different in its facts from the one at bar, and was decided on the good-faith doctrine. The court said: "The directors, in making the appraisement and valuation and dealing with their stock subscriptions, acted in a fiduciary capacity and were bound to discharge the duties of a trustee with fidelity. This appraisement, it is manifest, was illusory and made only in the interest of the directors who were to profit by it, and the defendants, so far as concerns the claims of creditors, have paid nothing on their subscriptions and are indebted for the full amount thereof."

The foregoing citations are from jurisdictions which exonerate the subscriber from liability, if good faith characterized the giving and accepting of property for stock. It is evident that tested by the principle those courts enunciate, the stock of the respondents has not been fully paid. While none of these parties were connected with the original scheme of the Paducah Land Company, they all finally participated in projecting and organizing the Paducah Iron Company, which was thought necessary to consummate the land company's plans, and were parties or privies to the unwarranted impairment of the capital of the iron company. As a majority of its board of directors, they were peculiarly obligated to deal fairly with its capital stock. As was said in Elyton Land Co. v. Birmingham, etc., Co., 92 Ala., supra: "In making and accepting payment in property, they are bound

to exercise their judgment and discretion fairly and honestly directed to secure a substantial compliance with the contract," namely, the contract of subscription. While they probably believed they were paying true value for the stock they got, the law required them to pay face value.

We are compelled by the evidence to find they knowingly overpriced the furnace when they sold it to the iron company of which they were officers; that it was not then worth, at the most liberal estimate, the par value of their shares; that their subscriptions have only been partially paid and enough remains due on them to satisfy plaintiff's demand. The individual respondents are, therefore, bound to contribute to make good his judgment against the insolvent company in proportion to their respective holdings of its stock.

The judgment of the court below is reversed and the cause remanded with directions to ascertain the sum which each of the said individual respondents ought to contribute to satisfy plaintiff's judgment, computed according to the amount of stock he holds in the Pudacah Iron Company, and to enter a decree against respondents for such sums and for the costs of this litigation. All concur.